IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO WILLIAMS; JOHN HUNTER,<br><br>Plaintiff,<br><br>v.<br><br>SCOTT KERNAN; RON DAVIS; Y. SAMARA; R. BROOMFIELD; T. BOERUM; N. WALKER,<br><br>Defendants. | No. C 18-5787 WHA (PR)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF No. 59) |

**INTRODUCTION**

Plaintiffs Mario Williams and John Hunter are California prisoners who jointly filed this pro se civil rights case under 42 U.S.C. § 1983, claiming that defendants Scott Kernan, Ron Davis, Y. Samara, R. Broomfield, T. Boerum, and N. Walker, violated their constitutional rights at San Quentin State Prison ("SQSP"). The First Amended Complaint ("FAC") is the operative complaint. Defendants filed a combined motion to dismiss for failure to state a cognizable claim for relief and for summary judgment on plaintiffs' due process and equal protections claims. The motion was granted. Additional claims by Williams under the First and Eighth Amendments remained, and defendants now move for summary judgment on those claims. Williams filed an opposition, and defendants filed a reply brief. For the reasons discussed below, defendants' motion for summary judgment is **GRANTED**.

//

**STATEMENT**

Between January and March 2018, plaintiffs resided in an area of SQSP's Facility B known as "the dorms." On January 5, 2018, prison officials integrated "sensitive-needs" inmates into the prison's general population to provide such inmates with more access to a variety of prison programs. In several incidents shortly after integration began, inmates in the dorms committed serious acts of violence against inmates with sensitive needs, and prison staff found 12 weapons and plans for further assaults among dorm inmates affiliated with "security threat groups." In order to allow officials to investigate and identify the threatening inmates, on January 18, 2018, defendant Davis imposed a "modified program" on all inmates in the dorms. Upon completion of the investigation, officials discontinued the modified program on March 12, 2018, 53 days after it began.

Williams claims that the modified program violated his First Amendment right to observe his religion as a Jehovah's Witness. The modified program prohibited inmates from traveling from the dorms to the chapel, which was located in another section of the prison (Facility A), because several inmates from the dorms had attacked other inmates in Faculty A. Chaplains of a variety of denominations visited inmates in the dorms, but there was not a Jehovah's Witness chaplain because not enough SQSP inmates were Jehovah's Witnesses to warrant hiring one. The Catholic chaplain was available to minister to Jehovah's Witness inmates and provide them with literature and other necessary religious items. Dorm inmates were also allowed to pray in their cells. Williams states that his religion prohibited him from attending services with people of a different faith.

Williams also claims that the conditions of the modified program violated his Eighth Amendment rights. Williams states that he did not receive from officials, and could not purchase, soap, toothpaste or toilet paper during the modified program. He also claims that he did not have adequate lotion to address his dried skin. On January 17, 2018, he requested health services to address the problem, and two days later, a nurse gave him antifungal cream. Approximately two weeks later, his skin was better. On February 22, 2018, he ran out of cream and received more.

Williams also alleges that the temperature in the dorms was freezing during the modified program. Officials received two requests to fix the heat, on February 15 and 20, 2018. Each time,

an engineer inspected the fan belts and motors and found them to be working, and he also reset the heating system. Williams received one blanket, and three pairs each of pants, underwear, and socks, and three shirts. According to Williams, the heat was off during the entire modified program, officials did not fix it, and the temperatures were at or below freezing.

Williams alleges he suffered from back pain, which increased because he could not access the yard for exercise and could not buy ibuprofen at the canteen. Williams had yard access once during the modified program because officials restricted such access to specific rotations. When Williams complained about his back pain, a nurse provided him with ibuprofen. During the modified program, narcotics anonymous and other such support programs did not continue.

**ANALYSIS**

I.   STANDARD OF REVIEW

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014).

Defendants must produce evidence proving failure to exhaust in a motion for summary judgment under Rule 56. *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. *Id.* at 1166. The defendant's burden is to prove that there was an available administrative remedy and that the prisoner did not exhaust that available administrative remedy. *Id.* at 1172. Once the defendant has carried that burden, the prisoner has the burden of production. *Ibid*. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing

and generally available administrative remedies effectively unavailable to him. *Ibid.* But the ultimate burden of proof remains with the defendant. *Ibid.*

II. **ANALYSIS**

Defendants argue that Williams failed to exhaust his administrative remedies, that he did not suffer a constitutional violation, and that they are entitled to qualified immunity.

1. EXHAUSTION

The Prison Litigation and Reform Act ("PLRA") requires exhaustion of all available administrative remedies prior to filing suit in federal court. 42 U.S.C. § 1997e(a). This requirement is mandatory, *Woodford v. Ngo*, 548 U.S. 81, 84 (2006), but a remedy is effectively unavailable and the obligation to exhaust excused when officials administer the remedy in such a way that it, practically speaking, is a dead end, or when officials obfuscate or employ other machinations to thwart inmates from using a remedy to redress their grievances, *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).

Williams filed or participated in at least six different administrative grievances about the issues raised here surrounding the modified program, at least one of which he pursued through the third and final level of review under the applicable regulations. The first grievance came early in the modified program, and officials denied it on the grounds that the program was ongoing and being evaluated on a daily basis. The continuation of the program — including the conditions about which Williams and other inmates complained — would not seem to justify a decision not do address those conditions. In any case, the explaining that officials were evaluating whether to continue to the program would have begged the inmates to re-file grievances if the complained-of conditions did in fact continue. Over the coming weeks, Williams and other inmates did just that: they continued to file additional grievances asserting that the conditions were problematic and continuing, and yet officials denied those grievances on the grounds that they were duplicative of the original grievance. The successive grievances were not duplicative; although they complained about the same conditions, each grievance complained about the continuation of the conditions over additional days and weeks. By not addressing complaints because the program was ongoing and being evaluated, and then not addressing the complaints as duplicative when the problems continued and the inmates

tried to re-raise them, officials created a dead-end and thwarted Williams's diligent efforts to raise his claims via the available administrative procedures. The rendered such procedures effectively unavailable to him. Defendants are not entitled to summary judgment on exhaustion grounds.

2. CONSTITUTIONAL VIOLATIONS

a. RELIGIOUS PRACTICE

Williams claims that defendants violated his First Amendment right to practice his religion because he could not attend Jehovah's Witness services and did not have access to Jehovah's Witness clergy during the modified program. To establish a free exercise violation, a prisoner must show that an official burdened the practice of his religion without any justification reasonably related to legitimate penological interests. *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008). A prison regulation that impinges on an inmate's First Amendment rights is valid if it is reasonably related to legitimate penological interests. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).

Williams complains about not having access to Jehovah's Witness services or clergy. With respect to services, the chapel where the services took place was in Facility A, a separate unit from the "dorms" where Williams resided. That inmates may be segregated from other prisoners either for their own protection or for disciplinary reasons does not deprive them of their right to free exercise, e.g. to attend religious services. *See Beck v. Lynaugh*, 842 F.2d 759, 761 (5th Cir. 1988); *Mawhinney v. Henderson*, 542 F.2d 1, 3 (2d Cir. 1976). The parties do not dispute the evidence that inmates from the dorms had escaped and violently attacked "sensitive need" inmates in Facility A, that more attacks were planned, and that some of these attacks had occurred during transit to the Facility A facilities such as the chapel. Officials reasonably decided that in order to prevent future attacks they kept the dorm inmates out of Facility A until they investigated and identified dangerous inmates and moved them to another prison. Security interests may require prisons to restrict attendance at religious services, but the inmates must be provided with an alternative means of meeting the need for those services. *McCabe v. Arave*, 827 F.2d 634, 637 (9th Cir. 1987). The evidence is undisputed that Williams could pray in his cell and request and receive any readings, literature, or Jehovah's Witness items from other chaplains, including the Catholic priest. There is no evidence disputing the security threat that prompted the modified program, no evidence that the

1  segregation of inmates was an unreasonable response or lasted longer than reasonably necessary to
2  address the threat, or any evidence that Williams did not receive alternate means to observe his faith.
3      The lack of a designated Jehovah's Witness chaplain does not establish a First Amendment
4  violation, moreover, because prison officials have no affirmative obligations to provide clergy for
5  inmates specifically designated to their faith. *Ward v. Walsh*, 1 F.3d 873, 880 (9th Cir. 1993).
6  There is no dispute that Williams had access to clergy of other faith during the modified program.
7      There are no triable issues that, if resolved in Williams's favor, established that the modified
8  program violated Williams's First Amendment rights.
9          b.      Eighth Amendment
10     Williams claims that the conditions of the modified program violated his Eighth Amendment
11 right to be free from cruel and unusual punishment. A prison official violates the Eighth
12 Amendment when two requirements are met: (1) the deprivation alleged must be, objectively,
13 sufficiently serious, and (2) the prison official possesses a sufficiently culpable state of mind.
14 *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In prison-conditions cases, the necessary state of
15 mind is one of "deliberate indifference." *Ibid.* A prison official cannot be held liable under the
16 Eighth Amendment for denying an inmate humane conditions of confinement unless the standard for
17 criminal recklessness is met, i.e., the official knows of and disregards an excessive risk to inmate
18 health or safety. *Id.* at 837. The official must both be aware of facts from which the inference could
19 be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Ibid.* An
20 Eighth Amendment claimant need not show, however, that a prison official acted or failed to act
21 believing that harm actually would befall an inmate; it is enough that the official acted or failed to
22 act despite his knowledge of a substantial risk of serious harm. *Id.* at 842.
23     Williams complains that he did not receive sufficient time on the exercise yard during the
24 modified program. The deprivation of outdoor exercise for security reasons generally does not
25 violate the Eighth Amendment. *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993). This
26 includes the deprivation of outdoor exercise during a lock-down occasioned by inmate violence. *See*
27 *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980). When violence rises to high levels,
28 prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help

bring the violence under control. *Norwood v. Vance*, 591 F.3d 1062, 1068-70 (9th Cir. 2010). That Williams could only get outside for exercise once during the 53-day program did not violate his Eighth Amendment rights because there is no dispute that inmate violence triggered the restrictions, nor is there any evidence that they lasted longer than reasonably necessary to investigate and control the violence. *See*, *e.g.*, *id.* (granting qualified immunity to officials for deprivation of outdoor exercise during four extended lock-downs over the course of two years); *Noble v. Katz*, 636 F.3d 525, 529 (9th Cir. 2011) (granting qualified immunity for 14-month lockdown that followed violent riot against staff).

With respect to the other conditions of the program — the cell temperature, the lack of toiletries and lotion, and back pain — there is no evidence that defendants were deliberately indifferent to such conditions. Williams complains that the temperatures in the dorms were "freezing," but the only evidence of defendants' knowledge of that problem is the evidence that officials received two complaints about the heat. On those occasions, an engineer checked the heating system, tested and restarted it, and found it to be working. There is no evidence that defendants knew about the inadequate temperatures on other occasions but failed to take reasonable steps to abate them. Williams complains that he did not have enough toilet paper, soap, or toothpaste during the lock-down, but there is no evidence that the shortage was sufficiently severe to implicate the Eighth Amendment or that defendants had any knowledge of it. Williams also complains that he did not have enough lotion to prevent his skin from cracking, but the evidence is uncontradicted that when Williams alerted officials to this problem in two health care requests, he received medicinal cream that successfully addressed his symptoms. Williams also complains that the lack of outdoor exercise exacerbated his back pain, but he was allowed to stretch and exercise indoors and received ibuprofen. In any event, there is no evidence that Williams had a medical condition that necessitated outdoor exercise, much less that defendants knew about and disregarded it. Lastly, Williams's complaint that he did not have access to Narcotics Anonymous does not suggest a constitutional violation because there is no constitutional right to such rehabilitative programs. *See Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985).

There are no triable issues of fact that, if resolved in Williams's favor, would establish a

violation of his First or Eighth Amendment rights, even when considering the evidence in a light most favorable to him. Defendants' make additional arguments for summary judgment, but because of this conclusion, such arguments need not be reached.

## CONCLUSION

For the reasons set out above, defendants' motion for summary judgment is **GRANTED.** The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: February   4  , 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE